UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON

CIVIL ACTION NO. 6:07-166-KKC

MICHAEL BERNARD and
ACTON ENTERPRISES, INC.,                                                                PLAINTIFFS,

v.                             **OPINION AND ORDER**

CITIZENS NATIONAL BANK,                                                    DEFENDANT.

\* \* \* \* \* \* \* \* \*

This matter is before the Court on the Motion for Summary Judgment (DE 31) filed by the Defendant, Citizens National Bank. The Plaintiffs and Citizens entered into an agreement by which Citizens assigned the Plaintiffs certain rights under two promissory notes between Citizens and a company called Stardust Yachts, LLC.

The Plaintiffs assert that the agreement between them and Citizens fails for lack of consideration and, thus, is null avoid  They also assert  that, in entering into the agreement, they detrimentally relied on certain promises by Citizens.

The Plaintiffs previously moved for summary judgment in their favor on both claims which the Court denied by Opinion and Order dated March 26, 2009.  Citizens now moves for summary judgment in its favor on both claims.

      **I.**       **FACTS.**

      **A.**       **Background.**

The facts of this matter were set forth by the Sixth Circuit Bankruptcy Appellate Panel in *In re Stardust Yachts, LLC*, 385 B.R. 799 (6th Cir. BAP April 9, 2008)(unpublished) as follows:

> Stardust Yachts, LLC ("Debtor") borrowed money from Citizens National Bank ("Citizens") with a balance owed of approximately $497,000. The loan was

secured by a first priority lien on all of the Debtor's personal property. The Debtor also borrowed approximately $3 million from G & G LLC ("G & G"). This loan was secured by a first priority lien in favor of G & G on all of the Debtor's real property, and a second priority lien on the Debtor's personal property.

The Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code and quickly filed a motion to authorize and schedule an auction to sell substantially all of its assets. The bankruptcy court granted the motion and issued a Sale Auction Procedures Order that established the bidding procedures. The auction was scheduled for March 7, 2007, at the offices of Debtor's counsel.

Prior to the auction, Citizens and G & G discussed the allocation of proceeds of the sale between real and personal property in the event that a bid was accepted by the Debtor, and approved by the bankruptcy court, for all of the Debtor's property. Evidencing these discussions is a letter from G & G's counsel to counsel for Citizens dated March 2, 2007, which "confirms [their] agreement" that "... in the event a bid is accepted by the Debtor and approved for all of the Debtor's property, the proceeds will be allocated as follows: 22% represents the value of the Debtor's Personal Property, in which [Citizens] has a more senior lien than G & G, and 78% represents the value of the Debtor's Real Property, in which [G & G] has a lien." In closing the letter, G & G's counsel requested that counsel for Citizens sign in the space provided to indicate her agreement and return a copy. Counsel for Citizens did not sign or return the letter.

On March 6, 2007, counsel for G & G prepared and sent a subsequent unsigned letter that "clarifi[es][his] March 2, 2007, letter on [the] agreement related to the sale of assets." The "agreement" as to the allocation of proceeds reads the same as that in the March 2, 2007, letter. Once again, the letter requested that counsel for Citizens indicate agreement by signing the letter in the space provided and returning a copy. Again, counsel for Citizens did not sign or return the letter.

On March 7, 2007, prior to the time of the auction, the [Plaintiff, Michael Bernard,] entered into an Assignment of Secured Claims, Notes, Security Agreement, and Guaranties ("Assignment") with Citizens through its Executive Vice-President, Charles Farris. The Assignment contains a detailed description of the rights and interests that were transferred. However, it makes no reference to the auction or an agreement with G & G regarding allocation of sales proceeds. [Bernard] asserts that he paid $300,000 for the notes.

In addition to being a secured creditor with a lien on the personal property of the Debtor by virtue of the Assignment, [Bernard] was previously granted a super priority lien in the amount of $120,000 on the Debtor's equipment and inventory to secure post-petition financing provided to the Debtor. Pursuant to the Sale Auction

Procedures Order, [Bernard] had the right to credit bid his super priority loan of $120,000, and the Assignment of Citizens' claim of approximately $505,000 for a total credit bid of $625,000.

The auction took place as scheduled on March 7, 2007. Counsel for the Debtor conducted the auction in three phases: (1) real property only; (2) personal property only; and lastly (3) real and personal property together. In the first round, G & G submitted the highest bid, a credit bid of $2 million. Bidding was then closed. In the second round, [Bernard] made the highest bid for the personal property of $250,000. Several bidders then asked to adjourn the bidding to determine if any competing bidder would top [Bernard's] bid. The bidding was adjourned and when the bidders returned they advised that they would make no further bids. According to [Bernard], he then advised that he had more "credit to bid" and was told by Debtor's counsel that it was unnecessary to bid higher. Second round bidding was then closed. In the third round, G & G made the highest bid for both real and personal property together with an over bid of $10,000 for a total bid of $2,260,000.

At that point, either counsel for [Bernard], or Michael Bernard himself, asked how the proceeds of sale would be allocated between the real and personal property. [Bernard] asserts that it was his counsel, who was new to the case, who made the inquiry. G & G does not state unequivocally who asked the question, only that it was someone on behalf of [Bernard], and exactly who is irrelevant. Regardless of who asked the question, the response was apparently that the allocation had not been determined. Apparently no one, including [Bernard], disputed that statement. There is no recording or transcript of the auction in the record to verify either version of events.

[Bernard] then requested that the second phase of bidding be re-opened to permit him to credit bid higher on the personal property. Counsel for the Debtor then contacted G & G's counsel to participate in discussions as to whether this should be permitted. [Bernard] explained that he "believed it was in the best interest of the debtor and its creditors to re-open the bidding for the real estate separately and the personal property separately to afford both G & G and [Bernard] the right to increase their bids, since their previous bids had not reached their respective credit bid allowances." The bidding was not re-opened to allow the requested deviation from the pre-auction announcement as to procedure. The third round bidding was continued and G & G's bid was accepted as the highest bid for the Debtor's total assets in the amount of $2,260,000.

The day after the auction, the Debtor filed a Report of Sale describing in detail the auction process and seeking approval for the sale of assets to G & G for $2,260,000. On that same day, G & G's counsel received an email from counsel for Citizens which read, in pertinent part, "[y]ou are correct that I was not authorized and

did not sign the letter agreement you sent to me regarding allocation and you are correct that Citizens has sold both of their notes to [Bernard]."

On March 9, 2007, [Bernard] filed an objection to the sale on the grounds that he was not permitted to bid up to the full amount of his credit bid for the Debtor's personal property. He asserted, therefore, the sale did not result in the maximum benefit to the bankruptcy estate and its creditors. Also on March 9, 2007, G & G filed a motion for an order allocating the auction proceeds in a 88.89/11.11 ratio of real to personal property, a ratio that was derived from the bidding at the auction. [Bernard] responded that a 78/22 ratio would be more appropriate. According to [Bernard], he purchased and took assignment of the claims of Citizens based upon statements from counsel for G & G and Citizens that the allocation would be 78/22, an allocation that was derived from appraisals obtained of each asset type when the Debtor obtained its loan from G & G. In support of his position, [Bernard] attached the March 2, 2007, letter from G & G's counsel to counsel for Citizens.

In response to [Bernard's] request that the proceeds be allocated in a 78/22 ratio of real to personal property, G & G asserted that while counsel for G & G and Citizens agreed that such an allocation would be appropriate, their clients never agreed. In support of this assertion, G & G noted that the March 2, 2007, letter was not signed by counsel for Citizens, and attached the March 8, 2007, email of counsel for Citizens stating that she was not authorized to sign the letter. G & G further relied upon its assertion that [Bernard] had asked at the auction how the proceeds would be allocated. According to G & G, [Bernard] would not have asked this question if he believed there was an agreement in place. Finally, G & G urged the bankruptcy court to allocate the proceeds in the ratio of the bids actually received, 88.89 to 11.11.

[Bernard] then filed two motions to supplement the record regarding G & G's motion for order allocating the sales proceeds. With the first motion, [Bernard] submitted a copy of the March 6, 2007, letter from G & G's counsel to counsel for Citizens. With the second motion, [Bernard] submitted an affidavit of Charles Farris ("Farris"), the Executive Vice-President of Citizens. Farris's affidavit reads in pertinent part as follows:

> 1. I am Executive Vice-President of Citizens....
> 2. I was the loan officer in charge of the matter of two unpaid promissory notes owed by [Debtor] to [Citizens]....
> 4. [Citizens' counsel] ... discussed with counsel for ... G & G ... the proposed auction sale of the debtor's assets, and how to allocate any aggregate purchase price if one bidder purchased both the real estate and personal property of the debtor in a combined bid.
> 5. I believed that [Citizens' counsel], counsel for G & G and debtor's counsel concurred that the best way to allocate any combined

4

>purchase price would be based on existing appraisals of the real estate and personal property, equating to approximately 78%/22%, respectively. There were some details to be resolved, possibly about carve-outs and/or taxes that I cannot recall, but which had no effect on the allocation percentages, to my understanding. I never heard any different numbers. It was my understanding that the allocation and terms were subject to the court's approval. I conveyed all this to [Bernard] in the presence of bank counsel during negotiations of the sale of Citizens' ... notes, etc. and before the sale of Citizen's notes, etc. was consummated.

The bankruptcy court held a hearing on G & G's motion for an order allocating the sale proceeds, and [Bernard's] motions to supplement the record. On March 27, 2007, the bankruptcy court entered an order allocating the proceeds from the auction sale. The court found the following: On March 7, 2007, the Debtor conducted an auction for the sale of its assets pursuant to a Sale Procedures Order. At that auction, [Bernard] had the right to credit bid his super priority loan of $120,000 and Citizens' assignment of its approximate $505,000 position secured by the Debtor's personal property. Prior to the auction and the assignment of Citizens' claim, G & G and Citizens were attempting to negotiate an agreement on the allocation of sales proceeds between the real and personal property at 78% and 22%, respectively. Those negotiations "were memorialized in two proposed letter agreements ... neither of which was signed by counsel for Citizens Bank." The bankruptcy court found that there was no binding agreement on the allocation of proceeds as evidenced by the March 8, 2007, email sent by counsel for Citizens in which she stated she was not authorized to sign the letters.

The bankruptcy court further found that [Bernard's] assertion that he detrimentally relied on oral representations as to the agreement to allocate the sales proceeds on a 78/22 ratio basis were undermined by his conduct both at and after the auction. Specifically, the court noted that during the third round of bidding "[Bernard] said, "I have a question, Mr. Bunch, how do you allocate the real and personal property sale price when you accept the aggregate bid. [Bernard] would not have inquired as to allocation of the proceeds had he believed that there was an agreement to which he was a beneficiary." Additionally, the court noted the fact that [Bernard] asked for the second round bidding to be re-opened undermined his assertion that he detrimentally relied on an agreement between Citizens and G & G.

Finally, the bankruptcy court found that [Bernard's] assertions in his Objection to Report of Sale undermined his argument. The objection was filed two days after the auction and requested that the auction be re-opened to allow him to bid his entire credit bid. The bankruptcy court found that [Bernard's] statements in the objection that "the proposed limited re-bidding process will also eliminate the

5

difficulty of allocating the aggregate purchase price between G & G and [Bernard] as secured creditors on different collateral" and that "approval of the March 7 Auction would unfairly reduce the percentage allocation that [Bernard] receives from the aggregate sale proceeds, a problem not contemplated in the Sales Procedure Order, the Notice of Auction, or by oral announcement prior to the Auction" revealed that [Bernard] was unaware of an agreement regarding allocation. Finally, the court found that:

> [Bernard] was not even aware of an agreement two days after the purchase of the claim an (sic) the auction. Second, his claims of detrimental reliance only appears (sic) in his Objection, Motion to Supplement and Second Motion to Supplement. These were all filed after G & G filed its Motion in which G & G stated that it had tried to reach an agreement with Citizens but had failed to do so.
> Second, the Objection to Report of Sale reveals that [Bernard] fully believed that the allocation was to (sic) based on the bidding prices made at the Auction. Otherwise, [Bernard] would not have objected to the Report of Sale based on the injustice of not being given the opportunity to bid the full amount of his credit bid which would have elevated the percentages allotted to his portion of the sales proceeds.

The court then sustained G & G's motion for order allocating sales proceeds and ordered that the proceeds be disbursed under a "88.89%/11.11% allocation scheme with a Sales Price for the Real Property of $2,008,914.00 and for Personal Property of $251,086.00." Pursuant to the bankruptcy court's order, [Bernard] shall receive $120,000 for its super priority lien and an additional $60,010.13 from the distribution of proceeds for the personal property.

This timely appeal of the bankruptcy court's order allocating the sale proceeds followed.

*Id.* at *1-6 (footnotes and citations to appellate record omitted).

### B. Decision by the Bankruptcy Appellate Panel.

On appeal to the Sixth Circuit Bankruptcy Appellate Panel, the Plaintiffs in this action raised three issues: whether the bankruptcy court erred in (1) not holding an evidentiary hearing regarding whether an agreement on the allocation of proceeds of the auction existed; (2) finding that there was no agreement regarding the allocation of proceeds from the auction of the Debtor's assets; and (3)

6

finding that the Plaintiff Bernard did not detrimentally rely on an agreement to allocate proceeds of the auction. *Id*. at *1.

The Bankruptcy Appellate Panel affirmed the bankruptcy court, finding first that the bankruptcy court did not err in failing to have an evidentiary hearing since Bernard had not requested one. *Id*. at *6.

The court further found there was no binding agreement between Citizens and C&G on the allocation of the sale proceeds, stating as follows:

> The March 2, 2007, letter regarding the discussions was never signed by counsel for Citizens. The March 6, 2007, letter was not signed by counsel for either party. Counsel for Citizens has clearly stated that she did not have authority to sign the agreement on behalf of her client. Furthermore, the March 2 and 7 letters do not rise to the level of clear and convincing evidence that G & G and Citizens had entered into an oral agreement given that G & G's counsel specifically requested in the letters that counsel for Citizens sign in the space provided to indicate agreement with the terms set forth in the letter. There is no evidence of a "mutual manifestation of assent," and, therefore, no evidence of a binding contract. The bankruptcy court's finding that Citizens and G & G did not have a binding agreement was not clearly erroneous.

*Id*. at *7.

The Bankruptcy Appellate Panel also determined that the record did not support a finding of detrimental reliance, noting that, under Kentucky law, detrimental reliance required evidence of a promise. The court determined:

> There is no evidence in the record to support a finding that there was a promise to [Bernard], and therefore, he cannot establish promissory estoppel. [Bernard] presented no evidence that G & G made a promise to him regarding allocation. In fact, Charles Farris' affidavit states that there were details in the proposed agreement between G & G and Citizens yet to be resolved and that the allocation and the terms were subject to court approval. Importantly, according to his affidavit, he conveyed this information to [Bernard] during the negotiation of the sale of Citizens' notes.

*Id*. at *8.

The court determined that the Bankruptcy Court erred in making findings about what happened at the auction when there was no transcript in the record. *Id.* at *8. Nevertheless, the court determined that, "[r]egardless of what happened at the auction, the [bankruptcy] court's finding regarding [Bernard's] actions after the auction are determinative."

> He filed his Objection to Report of Sale two days after the auction seeking an order for a new auction so he could bid his entire credit bid. In his brief, he stated "... the proposed limited re-bidding process will also eliminate the difficulty of allocating the aggregate purchase price between G & G and [Bernard] as secured creditors on different collateral. Approval of the March 7 Auction would unfairly reduce the percentage allocation that [Bernard] receives from the aggregate sale proceeds, a problem not contemplated in the Sales Procedure Order, the Notice of Auction, or by oral announcement prior to the auction." Certainly, if [Bernard] believed that there was an agreement in place with G & G regarding the allocation, he would not have made these assertions in his objection to the sale. These assertions reveal that even two days after the auction, [Bernard] believed the allocation would ultimately be based on the bidding prices made at the auction. As a result, the bankruptcy court's conclusion that [Bernard] did not detrimentally rely on the alleged agreement between G & G and Citizens was not clearly erroneous.

*Id.* at *8.

    **C.**    **This Action.**

Between the bankruptcy court order allocating the sales proceeds, which was entered on March 27, 2007, and the Bankruptcy Appellate Panel decision reviewing that order, which was entered on April 9, 2008, the Plaintiffs filed this action, asserting that their agreement for the purchase of the notes from Citizens should be null and void because it lacked consideration and because, in entering into the agreement, Bernard relied on the representations of Citizens regarding a 78/22 allocation of the auction proceeds.

The Plaintiffs previously moved for summary judgment in their favor on both counts. The Court denied the motion, stating "the Court finds no evidence in the record that Citizens promised

8

the Plaintiffs they would receive 22 percent of the auction proceeds." *Bernard v. Citizens Nat. Bank*, 2009 WL 864579 at * 7 (E.D. Ky. 2009). This Court cited the following statement from the Bankruptcy Appellate Panel:

> There is no evidence in the record to support a finding that there was a promise to [Bernard], and therefore, he cannot establish promissory estoppel. . . In fact, Charles Farris' affidavit states that there were details in the proposed agreement between G & G and Citizens yet to be resolved and that the allocation and the terms were subject to court approval. Importantly, according to his affidavit, he conveyed this information to [Bernard] during the negotiation of the sale of Citizens' notes.

*Id*. (quoting *In re Stardust Yachts, LLC*, 385 B.R. 799 at *8 ).

## II.     ANALYSIS.

Citizens' now moves for summary judgment in its favor on both claims asserted against it, arguing that it is entitled to judgment as a matter of law on the basis of this Court's statement that there is "no evidence in the record that Citizens promised the Plaintiffs they would receive 22 percent of the auction proceeds."

In response, the Plaintiffs continue to rely on Farris's affidavit which is attached to their response as Exhibit H. However, as both the Bankruptcy Appellate Panel and this Court have previously found, Farris's affidavit "states that there were details in the proposed agreement between C&G and Citizens yet to be resolved and that the allocation and the terms were subject to court approval. Importantly, according to his affidavit, he conveyed this information to [Bernard] during the negotiation of the sale of Citizens' notes." *In re Stardust Yachts, LLC,* 336 B.R. 799 at * 8.

Accordingly, this Court continues to find, as did the bankruptcy court and the Bankruptcy Appellate Panel, that there is no evidence in the record of a promise by Citizens to the Plaintiffs regarding the allocation of the bankruptcy proceeds.

For all these reasons, the Court hereby ORDERS that Citizens' Motion for Summary Judgment (DE 31) is GRANTED.

Dated this 11th day of March, 2010.

Signed By:
*Karen K. Caldwell*  KKC
United States District Judge